We want to switch the order of cases two and three this morning. And everybody is here on Midland Funding v. Hilliker. We'll move you up and we'll move Stanford v. City of Flora back. And then we'll take up Midland v. Hilliker. Thank you. Thank you. Good morning. May it please the Court. Good morning. The Circuit Court erred in denying Midland's motion to dismiss and compel arbitration because it found waiver when there was none, it found unconscionability when there was none, and it disregarded the plain language of the arbitration agreement and class action waiver that was contained in the card member agreement applicable to Ms. Hilliker's account. First of all, there was no waiver. Midland did not act inconsistently with its right to arbitrate. Specifically, one of the points that Hilliker heavily relies on is that we filed the initial debt collection action in the state court of St. Clair County. So is Midland one of those collectors that the Court made reference to 3,800 cases? Are you one of those debt buyers that just goes into St. Clair County and files a thousand lawsuits against people either in small claims or LM or L and try to collect? Do you have in-house counsel? Are you one of those kind of purchasers? Midland Funding does purchase delinquent debt from the original creditors, such as Chase and Citibank, those types of credit card companies, and then goes and tries to collect on those accounts in part through filing actions in state court. But you file a lot of them. I mean, you're not just – you don't compel arbitration on the majority, do you? Well, I don't believe so. That was not – that was never presented in the record in terms of the briefing. We never had a chance to respond to that below. What I would say is that here, the card member agreement allows Midland to file in the small claims division so long as it remains an individual action, and it allows Midland to assert its right to arbitrate claims that are raised if it has initiated a proceeding. So with regard to those two provisions in the agreement, we have not acted inconsistently with those rights because the agreement expressly acknowledges that there may be circumstances where the parties initiate a proceeding in state court, but the circumstances change such that the right to arbitrate can still be asserted. And that's what Midland did here. What circumstances are laid out in this agreement that allow for that? Excuse me, what? What circumstances are laid out in this agreement that allow you to make the choice that you just described? Right. There are two provisions. One is that if a party initiates a proceeding in state court and claims arise in that proceeding, such as a counterclaim, that we may assert our right to arbitrate with regard to new claims that are raised in that case. Secondly, a party – the parties are still allowed to bring small claims actions in the Here, it was not maintained as an individual action. Once Ms. Hilliker filed her Third Amendment counterclaim asserting for the first time statewide and nationwide class actions, it no longer remains an individual action and could be – and could – and Midland could assert its right to arbitrate at that point. Did the interrogatories that Midland refused to answer in any way put you on notice that they were seeking information about more than one plaintiff – defendant, more than Ms. Hilliker? I do not – no, I do not think it did put us on notice of that information. But the reason I ask is you all filed a motion for protective order. Yes. And it said in the motion for protective order that you didn't want to release information about anybody else except Ms. Hilliker. So I was just wondering why you would make that argument. Right. They're asking you to prove something about somebody else. Okay. The basis of that motion for protective order was to protect the purchase and sale agreement that was being sought. Midland – and as part of the purchase and sale agreement, there are several accounts, not just Ms. Hilliker's account, that sold. So those types of – that type of information about other plaintiffs – not other plaintiffs, excuse me – other account holders was not relevant to the case and should have been protected and didn't need to be produced. But we needed a protective order to confirm that either – that that information would be – could be redacted or could be subject to a protective order and treated confidentially if it was produced. Switching topics on you. Yes. I apologize. That's fine. I have two questions. Do you claim that this arbitration agreement was clearly visible? I noticed you talked about the bold headings. Is that your position on appeal here, that this – one of the reasons this should be enforced is because everybody can see it, read it, know about it? Yes. It is our – it is our position that it was procedurally conscious. It was easy to find, read, and understand. It is in bold. So is this the actual font type that you've given us in the appendix of the arbitration agreement? Like, when we look at this, is this font – and I'm looking specifically at Exhibit – the cardholder agreement, which is Exhibit 4. Is this the length – the font size that we're to consider, or did you reduce it, you know, to fit on a page, or? That is the copy that we were provided from Biola Chase. And you put it in a long folder, and you had to flatten it, or? No. The one that is – that is the one that you're showing me there. I believe it's Exhibit 5, 2, Declaration. That is actually the template, because the original – oh, it was Exhibit 4. I'm sorry. Exhibit 4 was the template. That was more legible than Exhibit 3, I think it was. Ultimately, we found a more legible copy, and that is attached to the appendix of A23 and A24. And that is what we understand – what was the terms and conditions that were provided to the cardholder. So A23, when I look at your appendix, that's the actual font size? I just want to make sure I understand, when we go through this, how observable the arbitration provision is. Right. It's my understanding that this would have been printed out on a pamphlet, so it possibly could have been larger. I will admit that those facts are not in the record at this time. But the arbitration agreement contained in that document does have a bold heading with regard to arbitration agreement, and it is in all caps. And in that paragraph, it does provide that the cardholders are waiting – they are right to bring a class or serve as a class representative or be a member of a class. So are you asking this Court to just carve out the class allegations and let you proceed under the full language of the arbitration agreement? I mean, is that the remedy you're seeking? Well, the remedy we're seeking is that the district court case – or the circuit court's opinion be reversed and remanded with instructions to compel arbitration. But not class arbitration. Right. No. The parties never agreed to class arbitration, and Mrs. Hilliker waived her right to seek class arbitration or waived her rights to any type of class relief. Okay. I want to ask you who these people are, if you'll just listen carefully. Okay? This is your agreement, as I'm A23. It says that for the purposes of the arbitration agreement, we, us, and – sorry, I can't read it – includes our parents, subsidiaries, officers, licensees, predecessors, successors, assigns any member of your account or any purchaser of your account, and additionally, it includes any third party providing benefits, services, or products in connection with the account, including credit banks, merchants, credit card – you get the idea. But I want to know how you can bind a party to an arbitration agreement that is so broad that it includes third parties with this kind of language. I mean, who are your predecessors? Is that Chase Bank's predecessors? Is that Midland's predecessors? Is it their successors? Is it their lawyers? I mean, what is this person really agreeing to? This person is agreeing to arbitrate and waive class remedies with regard to claims that arise from this card agreement and arise from her account with Chase. And that agreement to arbitrate claims regarding this account and this agreement applies not only to Chase but to its successors. And successors. Right? That is what it says. And officers, directors, and we don't know even who in time these persons – they can change over time, right? According to the language. Well, yes.  And we are entitled to step in the shoes of Chase and assert the rights that Chase had under the agreement. But who are all of these third-party people and successors and assigns? And who are these people that the cardholder is releasing? Does that make it procedurally unconscionable or even substantively unconscionable? No, I do not believe that it does. I don't believe that – because Ms. Hilliker or other account holders know that they are waiving arbitration – not waiving arbitration. They're agreeing to arbitration and waiving class relief as it relates to the claims of this account. And if those claims are brought by someone who sold a third-party – then it is possible that they are bound by this arbitration agreement. Now, I also notice NAF is included in this agreement. You recognize they're no longer allowed to arbitrate. Yes, but – We have a Supreme Court case on that which acknowledges NAF is – as in accord with the Minnesota Attorney General. You're familiar with all that? Not entirely, no. But I do recognize that the American Arbitration Act still arbitrates consumer – AAA. AAA. That's okay. The American Arbitration Association, you're right, does allow arbitration of consumer complaints. So you're not claiming that NAF is in any way involved here and can be stricken without problems to the clause? Yes, because there's a choice. I would say there's no problem if NAF can no longer arbitrate consumer claims. Okay, I'm sorry to interrupt you. I know you were going toward waiver and, I think, unconscionability. I'm going towards all of them. I get it. To just go back to waiver quickly, I would say that also Hilliker relies on some other conduct to establish our waiver of the right to arbitration, such as filing motions to dismiss and our discovery behavior. Courts in Illinois and the federal courts construing the FAA, which applies to this case, have found that filing a motion to dismiss is not dispositive of the right to arbitrate. Those are cases like Sharif and LAS. And also, recently, with regard to discovery behavior, what was happening in this case is Midland was responding to plaintiff's requests or complying with court orders. It was not issuing discovery to plaintiff, or to Ms. Hilliker, excuse me, and it was not using the tools of the court to try to prove its underlying debt collection action or defend itself against the counterclaims. And a recent case, Kohler v. Packer Group, acknowledges that this type of responsive conduct, where you're not issuing subpoenas or other documents or issuing depositions or taking depositions, is not the kind of discovery behavior that arises, that is inconsistent with the right to arbitrate. So by filing a motion protective order for documents that the court was requiring us to produce, we were not inconsistent with our right to arbitrate because we were simply trying to comply with the court's order and protect the documents that the court was trying to, was requiring us to produce. You know, I'm curious how you can take that position because you filed first, and then the defendant filed two motions to compel against Midland, to compel discovery. So how can you say that you were complying with discovery? The first time it took, the first motion to compel, they gave you 60 days. The second motion to compel, they gave 30 days. How is that compliance? Well, we did respond to the interrogatories and document requests. Plaintiff did not, or Ms. Hilliker did not like our responses. When did you respond? I'm sorry. I mean, was it more than 30 days after? It's possible. I don't remember that detail. Off the top of my head, I'm happy to go try and look it up. Then they did seek court intervention in terms of getting us to provide additional information. And at that point, we complied with court orders as well to provide that information. So you didn't file a motion to compel arbitration until like 18 months or more after you first filed the complaint in St. Clair County? Right. After you guys chose the forum? We filed in March 2015, three weeks after Ms. Hilliker filed her third amended counterclaim that alleged for the first time a class. But by filing, just the filing in St. Clair County,  That you chose that forum? Is that enough for a waiver? I do not believe that is enough for a waiver. We did not act inconsistently with our rights under the agreement, as I described earlier. And moreover, cases such as Liberty Chevrolet v. Rainey, Household Finance v. Boober, and even the cabinetry case that Hilliker relies on heavily recognize that certain circumstances in a case may allow, there may not be a finding of waiver, even if an action was initiated in the state court. And for example, in cabinetry, what happened there is cabinetry involved, again, extensive discovery, where the defendant participated in the discovery, issued discovery, received 2,000 documents from the plaintiff, and just six months before trial decided to invoke its right to arbitration. The court said that's too late to do that. That's not our circumstances here. There was no trial date. There was no discovery cutoff date. And we did not use any of the tools that the court allows in terms of discovery and things of that nature. But even cabinetry recognized that other unexpected developments might occur where it does not signify intention to proceed to the exclusion of arbitration. And that happens here when we never even had a chance to object to Ms. Hilliker's assertion of a class remedy. At no point did we act inconsistently with the right to waive, with the right to arbitrate or oppose her assertion of class claims. Why wasn't it raised as your first pleading? It was raised as our first pleading in response to the Third Amendment counterclaim. Well, they had an original counterclaim against you all. You chose not to raise it then, right? Right, because we were still in the Small Claims Division and it was still an individual action. You were in LM, not S. You were not in the Small Claims Court. You were in LM. We were in the Arbitration Division. LM. I believe that's LM in St. Clair County. Oh, it was marked R on my docket sheet, so I apologize. But still, it was less than a $10,000 claim. I see that my time is up. Thank you, Counsel, and you'll have a chance to re-vote. All right, thank you. Argument to the accolades. Thank you, Your Honor. Good morning, Your Honor. Good morning. So I want to talk about the history of the case to clarify where it was at and when. So this case was originally filed in AR. AR is what LM used to be over in St. Clair County. Thank you. Supreme Court Rule 90C and the Supreme Court Rule 90 gives us AR, so it's an arbitration panel, which shows you still use discovery processes. All those things are provided for in the Supreme Court rule. This case was never in small claims because the amount of claim was $8,893, so it couldn't have been in small claims. So this is never a small claims case, so let's forget about that one because it just isn't true. So what's important here is this case was filed in a regular civil faction in St. Clair County. They filed it. I'm the defendant. They're the plaintiff. So after I started figuring all this out, and I would refer the court to an article I cited in my brief called Dirty Debts, Dirt Cheap. It talks about, Justice Kagan, your question about what is this industry. Well, this industry is a group of companies like Midland, Asset, LVMV, companies like that that go to debt originators, and they're debt originators like credit card companies. A good example is Household Financial. They're a household lending company. And once people default from those loans, these companies buy those debts, usually for somewhere between three and five cents on the dollar. So if you've got a $10,000 debt like my client, they'll pay between $300 and $500 for that debt. And then what happens, and I supplied this to the court at the trial level, and as a matter of fact, it's on the written transcript at page 43, that this company, since 2005, has filed approximately 4,000 lawsuits. Counsel pointed out to the court that I looked through, I tried to look through those records when I went to Clark's office, and I couldn't find another one where there had been demand for arbitration. What happens here, and what happens in all these cases, is these companies buy spreadsheets, and these spreadsheets come from the originating creditor or from another debt buyer. They swap these things back and forth. They swap these debt agreements. Excuse me. And they get a spreadsheet. They don't even get the underlying documents. All they get is a list that shows here's what this person owes, here's what their address is, and then they file a suit. And the reason they do that, and this is laid out in the Dirty Debts Dunder Chief article, and I argued about it at the trial court, is that they want to get these people in front of the judge because the judge has more breadth and an authority figure over them, so they'll start paying. And once they appear in court, either they start paying or they get a default judgment because most of these people can't afford a lawyer. Obviously, if they're already behind their credit cards, they're not going to go out and hire a lawyer at a couple hundred bucks an hour to defend them against Midland Funding or the rail. So that's how we got where we're at today, is that I defended this lady and started figuring out what was going on here. And one of the ways I figured it out was this article, and I went to the court with the clerk's office, and then I filed my counterclaim. And my original counterclaim is all about what have you done in the other cases, what have you done, you know, what is your practice? I asked for discovery. And much like one of the cases the court recently decided about discovery, I got objections to everything, okay, including who signed the discovery. So, of course, I filed a motion. You got an objection to who signed the discovery? Essentially, who answered the discovery, it was an objection. I always loved that one. Who answered the discovery? Objection. But anyway, that's the practice now. Unfortunately, that's where we're at, is that everything is an objection. So, you know, my practice now is to wait for 30 days and file a motion to compel, what I did in this case. Again, they were giving me 60 days, and they didn't answer anything. Another 30 days. Did they file more objections after the 60 days? Basically, I was ignored. You were ignored? I was ignored, so I filed another motion to compel. And really what led to the ripcord in this case, and I call it the ripcord because they jumped out of the plane and went to arbitration, was I had filed a motion for sanctions. That was my last ripcord. So I couldn't get any discovery about any of the other card member agreements. As a matter of fact, I heard the opposing counsel refer to the debt purchase agreement, the agreement that they filed a protective order over. I still haven't seen that. I don't know if there is. That's a good point. Is that in the appendix anywhere? I don't think it's in the appendix. I've looked for it. It's not in the appendix. There's a bill of sale, and that's very different. There's a big document somewhere. Because I've seen it in other cases. I know they exist. There's a big document that talks about here's what we're selling you. Here's our guarantees and warranties. It's usually 30 pages of documents. It talks about the debt purchase agreement. And usually what happens is that this big document comes with a CD. That's how these things get transferred. Or now they're actually doing it on the Internet. There's a secure site they use to transfer these debts. So did you ask for this agreement? Yes. As a matter of fact, that's what the protective order is about, is that they didn't want me to have that agreement. And you still don't have it? Nobody ruled on the protective order because they moved to compel arbitration. That's right. That is correct. I think that was one of the reasons they moved to compel arbitration is that they finally realized that I was getting close to what they considered to be their secret document. And I was asking for things that were going to lead to me figuring out fraud in this case. And I filed early on about consumer fraud, which is the ICAA. The ICAA provides that you go through consumer fraud. So I filed under the ICAA, Fair Debt Collection Act, and the Consumer Fraud Act. Let me interrupt you because there's another issue that I didn't get to ask, and I apologize. The FAA requires that you comply with arbitration to a valid contract, but that contractual defenses apply. Exactly. And so my question to you is, these affidavits that they filed, they provided you with some information contractually, but I don't see where your client's name or the contract number are attached. So under our rule of law where you have to attach the agreement that you're relying on in order to pursue enforcement of a contract, what is that amongst these? What are we supposed to consider? So that raises part of my case, Your Honor, is that when these pieces get filed by a lot of these companies, they file an affidavit, and that's attached to this one. The affidavit is where the person signing the affidavit has personal knowledge, which they don't. They have personal knowledge about this account, which they don't. They have personal knowledge to the extent that they know there's a spreadsheet. That's what they know. They know there's a spreadsheet, and they say, and my contention is this is wrong. They say it's good enough for them to file a lawsuit just looking at this spreadsheet. That's what's happening here. Okay. Which is the spreadsheet? Do you know the exhibits? We don't have that yet. That's part of the debt purchase agreement I was trying to get. Until I get an order from the circuit court forcing me to do that, I won't get to see that. And that leads into sort of part two of my argument, and I would have to put a footnote in here. While we were arguing this case at the circuit court, Justice Gates authored an opinion, Sturgill? Sturgill. Pardon? Sturgill. Sturgill, thank you, that laid out that the person advocating for arbitration has to prove an arbitration agreement. That's the first step. I don't believe the affidavit in this case comes anywhere close to proving an arbitration agreement, and neither did Judge Colfer. Judge Colfer said that there was no proof of an arbitration agreement. So that leads into what are the documents about arbitration? And, you know, I used to be a younger man, and I haven't stopped wearing these. We were a younger one. Yeah. My eyes have started failing me. So when they first produced, this leads to another question I've asked. When they first produced the, what they considered to be the card member agreement, they produced the document that is on the affidavit saying this was it. They produced the document that's marked A-12 in the appendix. Okay? Now, I defy anyone in the room to read this document without reading it, without cheating. And then if you take it to a photo doctor and you start enlarging it, you may have a chance of reading it. But as it exists and as they say, this was the agreement, as that exists, it's impossible to read. It's just impossible to read. So you get into the question of substantive procedural unconscionability. Then we had a long discussion in the hearing of this case about whether it was procedurally unconscionable because basically what they promised to pay for during the arbitration of this case is two days' fees. What the court knows, and my experience is, is that's the least expensive part of it. I mean, the problem we have with arbitration, and I'm going to talk generally for just a minute, there's a battle going on. There's a battle between people who advocate for arbitration to try to pull down small claims. Meaning if you have a claim that's a $1,000 claim, what lawyer in his or her right mind is going to take a $1,000 case that's going to cost $10,000 to prosecute? That's what's happening here is they want to defeat the small claim, whatever that small claim is, by making you spend more money to arbitrate than it's worth. And this happens all across the law. Let's pull back the veil and talk about what really happens. I do claims for him all the time, as I think the panel knows. If somebody walks in my office with a case worth $500, $1,000, $1,500, I have to tell them, this case is not financially possible. I can't do this case for you because it's going to cost you $10,000 for me to do even a small case. And it just creates such a burden on the person under this agreement that the court should find it unconscionable. All right. So then they produced what was considered to be the other document, which is page 23, actually, which is the longer document. I could find it again and read this thing or notice what's important about it. It's impossible. Then they produced the one that they asked the court to read, and that's the one that page a few shows earlier, which was one that's much larger. It's actually three or more. But they sign it affidavit saying it's an exemplar. It's what they get when they get the spreadsheet that shows here's the people that owe us money. It's an exemplar. What does that mean, exemplar? It's a sample? It's a sample. It contains the language it's supposed to be. My understanding is it contains the language, and this is in the argument, I believe, and in their briefs. It contains the argument. It contains the agreement in a form that you can read, which is basically what they're saying. And that's what's attached, and that's the larger one, Justice Gage, that you showed. Let me make sure I take a look at that. A23 and 25.4 are the large ones? Yeah. This is the one right here, A15. That was the one you were referring to earlier. This is the one that's formatted to a regular 8.5 by 11 page. That's never sent to the file. They never see that. So we can talk about uncountability. I think there are good arguments under the FAA, particularly Section 2, where it says that you basically have to honor state law. We won't encourage arbitration, but you have to honor state law. And our state law is that if you prove either form of uncountability, then that portion is knocked out. In this case, that's one of the things that Judge Bolton found. That portion gets knocked out because this process is uncountable. Finally, waiver. All right? If you read the Cabinet's case, Judge Posner's case, you read the Illinois State cases, it's about demonstrating a party's intent to litigate. That's what the whole thing is about. Waiver is demonstrating a party's intent to litigate. The reason there's a little confusion here, I think, is because all the cases cited on waiver are cases where the defendant is asking for arbitration. Very rarely does the plaintiff, who filed a lawsuit, ask for arbitration. I personally think that's enough. I think when you go, when you actually file a case at the courthouse, that is a presumption that you intend to litigate. What else could it be? Because it would be unethical to file a case that is not one that you intend to litigate. All right? Our ethics rules even require us to sign off the complaint and tell the truth. So I would be fraudulent to show up at the courthouse, file a case, and not really intend to litigate. I believe that just filing a case, filing a civil lawsuit, should be enough to cause a waiver. But if you don't believe that, there's more in this case. This case has a lot more. We have 18 months between the filing of the lawsuit, their prosecution of the lawsuit, and their attempt to pull the ripcord to get out of my discovery requests, my motion for sanctions. We have their motions to dismiss. And when I say motion, I'm not saying motion. I'm saying motions to dismiss. So they asked the court to dismiss my case. When that didn't work out, then they went up to the court and said, well, you should use your authority. And this is the really important part. You should use your authority to limit the discovery requests. How much clearer can you be to ask the court for its authority to exercise its authority to stop other parties from gathering information? It's not something you can do in arbitration. It clearly demonstrates an intent to litigate. And that's what this is all about, is it demonstrates an intent to litigate. I've cited the Glazier's case, and that's the only case I can find where the plaintiff is the one that is asking for arbitration. And the court said, when you file a lawsuit, you can't have a clearer intent than to be involved in litigation. And that's a pretty basic argument. And in that case, there was more involved. More things happened. But in this case, more things happened also. So not only do you have the filing, but you have the filing clause. Now, one of the arguments is the zombie arbitration clause. It really is the arbitration clause that they have never doubted. Let's say, for example, two years from now, we're litigating this case, and I hadn't filed a class action, and I filed superior damages. Does the zombie arbitration clause arise from grave, and do they get to use it again? I think the word they use in their brief is resuscitate. I think it is, yeah. And then maybe I should call it a resuscitated arbitration clause. I can only tell you. So I think the arbitration clause in this case was a long way by the time we got to the argument with Judge Colbert. I think Judge Colbert got it right. Judge Colbert addressed these issues, talked about his long experience with these kinds of cases and cases like this. You know, Judge Colbert's practiced law for 20 years before he took the bench, so he had seen a lot of this too. And he said he knew there were a lot of these kinds of cases. Let me ask you this. Under St. Croix County local rule, because of the amount of the claim, it was going to go to an arbitration panel under their arbitration local rule. Yes. Does that make any difference on your waiver argument? How does that cut on the waiver argument? So I don't think that makes any difference, and I'll tell you why. Because the AR rules allow either party to use all the resources of the court and to litigate. And the other thing about AR is AR, you have to agree to the resolution. If you don't like the resolution, you pay a fee, either $250 or $500, I think it is. This case would have been a $250 case. And you reject, and you go to a jury trial. This isn't an arbitration process where the parties are bound by the result. This is a method to resolve cases quickly. And it's a court-appointed arbiter? A court-trained, and then three, what happens is you go in a small room, and there are three arbitrators there, and they hear the case. And if you like the result, both parties let it stand. If you don't, then it's rejected, and you shortly go to a jury trial. What would have been interesting in this case is if the case had stayed in the AR division, and I went ahead and filed the class action there. I think I could have done it. I don't think it changes anything. I don't think the AR changes anything. That's just my take on it. Well, the AR was developed many years ago as a project by the Illinois Supreme Court. That's correct. And, I mean, that's just fortuitous that they ended up in AR because of the amount. Right, AR is the amount. As the court knows, cases get slotted by amounts. Sure. And I'm one of the trainers for the Sinclair Academy AR department. I enjoy that. I think it's very beneficial to the court system. I think it's a wonderful system because it takes those cases that clog up the docket. The car case is worth $12,000 and gets it resolved quicker if it can be resolved quicker. But the fact is it's still a case. You still take depositions if you want to. You can still propound discovery. That's what I was doing. I was propounding discovery. I was asking questions about their practice and their policies and procedures about when they file suits and what they do. So that's why it was in AR until I filed it, until I asked for a transfer because it became class action, because they were committing this kind of what I consider to be fraud. I'm not going to slander the other side with that, but what I consider to be fraud across all these cases. Let me ask you a question and sort of weave two concepts together. All right. You've basically got a waiver clause that perpetually enjoins your client from certain actions. But as a practical matter, places the plaintiff in this situation in a position where they can never waive their right to assert the arbitration agreement. So it has that inequality in it. Is that an element of unconscionability? Absolutely. I believe it is a demonstration of what I talked about in the very first part of my argument of the inequity in this situation. And there's this huge inequity because you have huge companies who hire legions of lawyers, usually springing out of law school like sharks drop teeth, who draft these agreements that are, to be very frank, I can't understand it. And I consider myself a reasonably intelligent person. The language in there is gobbledygook. And we expect someone who's probably not well-educated to understand these agreements and to pull out the magnifying glass or something larger to read the agreement. And the real legal fiction that we all, I guess, labor under is that people actually read these agreements. We all know. I mean, you've got an iPhone 10 update just the other day that required me to get a degree. I mean, the terms and conditions you had to get downloaded were like 300 pages. Did you read it? I know I did. I had a degree and moved on. I don't have time to read that document. And I understand, you know, when you sign up for a credit card, you're supposed to read the agreement. I get that. You know, we talked about that in the transfer. But it is an unfair situation when you have Chase Bank worth billions of dollars versus my client. And remember, this isn't Chase Bank. And this is an interesting part of this argument, is that I sued under the ICAA, the Illinois Collection Agency Act, and the Fair Debt Collection Act. These are statutes designed to regulate debt collectors. I was. Chase could never be sued. Chase Bank could never be sued for these things. Now, there's an argument that you can sue anybody for anything, but let's operate in a world of reality. Chase Bank can't be sued because they're acting as a collection agency. And I cited this in my brief, and I made this argument at the draft board. The actions that I'm describing and the— Sorry. Thank you, Counselor. Revella. May it please the Court. Justice Gates, you stated that, or you asked, the FAA requires compliance with arbitration agreements, in favor of arbitration agreements. But contractual defenses like conscionability apply, and that is true. However, in this context— Well, reduction of the contract would also. What's that? You have to have a meeting of the minds, right? So if you can't prove some meeting of the minds, would you agree that's a defense, that there is no contract? Right. There are several defenses that could apply to a contract. In this case, the United States Supreme Court has been clear that those defenses have to be applied equally among all types of contracts. Arbitration agreements cannot be singled out as more unconscionable than others, and that is what the circuit court did here. He found that the court was faster, it was more efficient, it was cheaper, and that it was unduly burdensome for Ms. Hilliker to bring those claims. Though the basis of the court's findings on unconscionability are hostile to the FAA. They're hostile when somebody says we can do it faster? Well, that's who we're taking. I mean, I noticed in your brief that you took a couple of shots at Judge Colker, you know, two days after you did this, he did this. I mean, that's not really what we should be talking about. We need the law involved here, so this is a tough case. I agree, but I do think, and I'm not begrudging Judge Colker, but what he said is hostile to arbitration. The AT&T mobility in that progeny of cases find that you cannot place barriers to arbitration. Now, Judge Colker, I acknowledge that he has a lot of experience, but at the same time, the FAA was applied, arbitration was originally applied, because the courts felt and the legislature felt that arbitration could be faster than the court system. 1927 or 1925? I don't know. This Act was passed in 1925 or 1927. I don't remember which. And maybe the courts were hostile, but we've come a long way since then. I mean, I think they were using muskets back then, so, you know. But let me ask you a question about, because I was confused, and I'm sorry to take up your time, but I thought these exhibits that you gave us with the affidavit were the actual exhibits, contracts that she would have signed. Now I'm told these are exemplars. Some are exemplars, some are not. And I had misread that, and I apologize for that, but I'm glad that it's cleared up. So what is an exemplar? That's not something you're claiming that she saw. No. What happened was Mr. Hannon, when we originally filed our motion to compel arbitration, because we realized we needed to do it diligently after the filing of the Third Amendment counterclaim, but once we did that, we realized that, oh, it was an illegible copy, the first one. I think it's Exhibit 3. I left it at my table. But we provided an exemplar at that time with our original motion to make it easier to read. Subsequently, we found the correct card member agreement, which is the 8.5 by 11 one, the longer one that's in the appendix. And that is the one Ms. Hilliker would have received that Chase said was associated with her account. Okay. Because I'm looking at your paragraph, and it says, I now have to read the account-specific card member agreement 3, Exhibit 3, in conjunction with Exhibit 4, in order to be able to read what it is you claim that applies to her account. Originally, that is what we needed to do, but subsequently we did find the correct card member agreement that was legible. You found a sample. You didn't find hers. You didn't find what she signed. Well, no signature is required under Illinois law with regard to credit card agreements. That's the Garber case and the Portfolio v. Feltman case. That is the usage of the account in a credit card agreement context that sets the terms and conditions. Okay. I just want to ask one other question, and then I'll let you go, and that is, how is it that Midland Funding intends to get these kinds of business records into evidence? I mean, putting something in the record right now is kind of easy, but you have to show regular course of business by Chase. You have to show all these things under Rural 236 and a rule of evidence. How does that happen with these kind of vague affidavits? Well, Your Honor, with regard to these types of business records where we receive them from a third party, such as Chase, Illinois law allows us to set forth the business records exception of the document but also state that those documents were incorporated into and relied on, were incorporated into Midland's business and relied upon Midland and its business. And those are cases like Northbrook Bank, Solis, and Bank of America v. Land. Bank of America v. Land? Land. Thank you. And by relying on those, by incorporating those documents into its system, into its records, Midland can establish a sufficient foundation under Illinois law to get those documents into evidence. Thank you, counsel. Before you do anything, can I ask a reasonable question? I'd like to please ask how you assess the briefs. Okay, go ahead. Okay. Go ahead, Justice Ginsburg. Before we recess, are either of you aware of a case out of the First District that was recently decided on the issue of waiver in arbitration agreements? Have you looked at that? What's the name of the case? I don't have it with me. I'm just wondering if you kept up on that. I did a brief search in the last week. I don't remember it being necessarily on point, but I can go back and – Well, if – Yes, if – take a look. And if you find – either of you find such a case, file a motion to supplement and reference this case, and then we'll give the other side an appropriate time to respond. But if within the next seven days you can take a look and either of you want to cite this First District case that Justice's case is referred to, please file a motion. We'll give the other side a chance to respond as well. Thank you, counsel. We'll take this case under advisement, and we're going to take a short recess. The next case we'll take up is the Stamp Quarterly Recess.